UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


EMMANUEL JAMARR ATKINS,

                Petitioner,                                 Hon. Janet T. Neff

v.                                                Case No. 1:10-CV-1093

JOHN PRELESNIK,

                Respondent.
_____/


**REPORT AND RECOMMENDATION**

        This matter is before the Court on Atkins' petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Atkins' petition be **denied**.


**BACKGROUND**

        As a result of events which occurred on March 29, 2007, Petitioner was charged with murder and possessing a firearm during the commission of a felony.  (Trial Transcript, November 6, 2007, 24).  Several individuals testified at Petitioner's jury trial.  The relevant portions of their testimony are summarized below.

**Lisa White**

White is William Berry's mother.  (Trial Transcript, November 7, 2007, 237).  As of March 29, 2007, White resided at 1209 Mills Street, Kalamazoo, Michigan.  (Tr. 238, 247).  On this particular evening, William was at the neighbor's house which was located at 1217 Mills Street.  (Tr. 238-41).  At approximately 10:00 p.m., White heard a single gunshot soon after which William Berry's brother, Isaiah Berry, carried William Berry home and "laid him on [the] porch."  (Tr. 239-41).  White immediately observed that William Berry had been shot in the head.  (Tr. 240).  Berry was pronounced dead later that night.  (Tr. 240-41).

**Isaiah Berry**

Berry spent the afternoon of March 29, 2007, at the neighbor's house located at 1217 Mills Street.  (Trial Transcript, November 7, 2007, 247-50).  At some point that afternoon, a black and grey Suburban stopped at the corner of Mills and Washington Streets which was considered to be on the "southside."  (Tr. 247-48).  The occupants of the Suburban, who were from the "northside" and the "eastside," exited the vehicle and "was gonna get into a fight with a group of people on the corner."  (Tr. 248-49).  However, before "they could even throw any blows or whatever," the police arrived at which point "everybody scattered."  (Tr. 249-50).  Neither Isaiah Berry nor William Berry were involved in this particular conflict.  (Tr. 250-51).

Later that evening, Isaiah Berry and William Berry were standing outside the residence at 1217 Mills Street along with some individuals that had been involved in the earlier conflict.  (Tr. 251-56).  The grey and black Suburban that Berry had observed earlier that day drove past the residence.  (Tr. 251-56).  The Suburban then turned around and again approached the

2

residence.  (Tr. 251-56).  As the Suburban passed the residence a second time, a single gunshot was fired from the rear passenger side of the vehicle.  (Tr. 251-56).  This shot struck William Berry in the head.  (Tr. 256-57).

**Brian Hunter**

As of March 30, 2007, Dr. Hunter was employed as a medical examiner and forensic pathologist.  (Trial Transcript, November 7, 2007, 289-90).  On that date, Dr. Hunter performed an autopsy on William Berry.  (Tr. 290).  The doctor discovered that Berry had been struck near the eye with a bullet that "traveled through the base of the skull" before exiting "through the back of the head" causing death.  (Tr. 290-93).

**Aquarion Johnson**

On the afternoon of March 29, 2007, Johnson was hanging out at the corner of Mills and Washington Streets, with several other individuals.  (Trial Transcript, November 7, 2007, 300-01).  At some point that afternoon, a Suburban in which "there was a whole bunch of. . .guys" passed Johnson and his associates.  (Tr. 300-01).  As the Suburban passed, Johnson's group yelled "southside" to which the group in the Suburban responded by yelling "northside."  (Tr. 300-02).  The Suburban then stopped and its occupants exited the vehicle with the intent to fight with Johnson's group.  (Tr. 300-01).  Before the two groups could engage, however, the police arrived and "broke that up."  (Tr. 301).

Later that evening, at approximately 10:30 p.m., the same Suburban returned to vicinity of Mills and Washington Streets.  (Tr. 296-300).  At the time, Johnson was standing outside

a nearby house with William Berry and several other individuals.  (Tr. 296-300).  The Suburban passed this house and then turned around and returned.  (Tr. 296-300).  As the Suburban passed the house a second time, a single gunshot was fired from the rear passenger seat striking William Berry.  (Tr. 296-302).  Johnson recognized the driver of the Suburban as an individual referred to as "Boodoo."  (Tr. 303-04).

**Dontario Hughes**

On the afternoon of March 29, 2007, Hughes was hanging out at the corner of Mills and Washington Streets, with several other individuals.  (Trial Transcript, November 7, 2007, 336-37).  That afternoon, a black and gray Suburban drove past the intersection at which point the vehicle's occupants began screaming "northside."  (Tr. 336-37).  The Suburban then "went somewhere and parked" after which its occupants approached Hughes' group.  (Tr. 337).  The two groups "was gonna fight or whatever," but before they could do so the police arrived "so everybody left."  (Tr. 337).

Later that evening, Hughes was hanging out at 1217 Mills with William Berry, Isaiah Berry, Aquarion Johnson, and several others.  (Tr. 337).  At some point that evening, the same Suburban returned to the vicinity.  (Tr. 337-41).  After passing this location, the Suburban turned around and returned.  (Tr. 337-41).  As it again passed the residence at 1217 Mills, a single gunshot was fired from the rear passenger seat.  (Tr. 337-41).  This shot struck William Berry in the head.  (Tr. 337-41).

**Michael Williams**

On the afternoon of March 29, 2007, Williams was hanging out at the corner of Mills and Washington Streets, with several other individuals.  (Trial Transcript, November 7, 2007, 363-64).  At some point, a black and grey Suburban drove past this location.  (Tr. 363-64).  As the Suburban drove past, the occupants began yelling "northside" and "eastside," in response to which Williams' group yelled "southside run the city."  (Tr. 364).  The Suburban then stopped and its occupants approached Williams' group.  (Tr. 364).  The two groups were going to fight, but before they could do so the police arrived.  (Tr. 364).  Later that evening, Williams was hanging out at 1217 Mills.  (Tr. 362-63).  At some point, Williams observed the same black and grey Suburban drive past the residence.  (Tr. 362-65).  As the Suburban drove past, a single gunshot was fired which struck William Berry.  (Tr. 362-65).

**Brandon Reardon**

As of March 29, 2007, Reardon was employed as a police officer for the City of Kalamazoo.  (Trial Transcript, November 7, 2007, 382-83).  At approximately 10:00 p.m. that evening, Reardon was dispatched to investigate a shooting at 1217 Mills.  (Tr. 383).  Upon arrival, Officer Reardon discovered that William Berry had been shot in the head.  (Tr. 383).

**Gerald Luedecking**

As of March 29, 2007, Luedecking was employed as a laboratory specialist for the City of Kalamazoo.  (Trial Transcript, November 7, 2007, 386-87).  Following the shooting of William Berry, Luedecking investigated the crime scene at 1217 Mills Street.  (Tr. 386-88, 396).

During his investigation, Luedecking recovered a bullet that was fired from a .45 caliber handgun, most likely a .45 caliber semi-automatic pistol.  (Tr. 388-94).

**Harold West**

As of March 30, 2007, West was employed as a Detective for the Kalamazoo Department of Public Safety.  (Trial Transcript, November 7, 2007, 433-34).  At some point that day, Detective Cordes asked Detective West to "help him interview a suspect in a homicide."  (Tr. 434). West agreed and the pair proceeded to interview Petitioner.  (Tr. 434-35).  Prior to speaking with Petitioner, Detective West informed Petitioner of his Miranda rights.  (Tr. 435).  Petitioner thereafter waived his Miranda rights and agreed to speak with the detectives.  (Tr. 435).

Petitioner initially stated that "he had nothing to do with the shooting" and that "he wasn't even around at the time the shooting occurred."  (Tr. 435-36).  Petitioner later, however, acknowledged that he was, in fact, riding in the Suburban on the evening in question.  (Tr. 436). Petitioner stated that earlier in the day he "was walking his dog" when the Suburban approached. (Tr. 436).  According to Petitioner, the occupants of the Suburban asked Petitioner if "he wanted to go to the southside with them to fight some individuals that they had been involved in a fight [with] earlier that evening."  (Tr. 436).  Petitioner asserted that he declined this invitation and instead simply requested "a ride over to his aunt's house."  (Tr. 436).  Petitioner acknowledged that he accepted a ride in the Suburban, but was only in the vehicle for "three to five minutes" and that he exited the Suburban before the shooting took place.  (Tr. 436-38).

Detective West testified that it appeared that prior to this interview, Petitioner "had been crying."  (Tr. 443).  The detective also concluded, based upon Petitioner's various behaviors

6

during the interview, that Petitioner was "being deceptive about his answers." (Tr. 443-44). When Detective West asked Petitioner if he would be willing to take a "gunshot residue test, to determine whether or not he had fired a weapon recently," Petitioner "very quickly" answered "no, I'm not taking any test." (Tr. 444).

**Antonio Maner**

On the afternoon of March 29, 2007, Maner and Quincy Lampkins "had a conflict with some other people" at the intersection of Mills and Washington Streets. (Trial Transcript, November 8, 2007, 459-61). Maner is from the "westside" and a group of people from the "southside" "tried to jump" Maner and Lampkins. (Tr. 459-62). As soon as this occurred, a Suburban "pulled up with a couple people in it." (Tr. 461-62). The occupants of the Suburban "jumped out" to assist Maner and Lampkins, but before "there was any actual blows," the police arrived and "broke it up." (Tr. 461-63). Maner then entered the Suburban which was being driven by an individual named "Boodoo." (Tr. 462-63).

After driving around for some time, Boodoo stopped the Suburban to let Petitioner get in. (Tr. 464-65). After Petitioner entered the vehicle, Maner informed Petitioner about the near fight that occurred earlier that day. (Tr. 465). Shortly thereafter, Boodoo stopped to pick up even more people. (Tr. 466-67). Maner told the other people in the Suburban that they should find the people from the earlier conflict and "beat their ass." (Tr. 464, 468-69). Later that evening, the Suburban returned to vicinity of Mills and Washington Streets. (Tr. 467-68). At some point, the Suburban turned onto Mills Street after which Maner heard a single gunshot which originated from the passenger side of the vehicle. (Tr. 469-78). Maner did not see this event, but indicated that the

gunshot originated from where Petitioner was sitting. (Tr. 469-78).

**Kharis Richardson**

On the afternoon of March 29, 2007, Richardson was riding around in a Suburban driven by Darris Stewart (a.k.a. Boodoo). (Trial Transcript, November 8, 2007, 522-29). At some point, Stewart drove past the intersection of Mills and Washington Streets causing "some dudes" who were standing on the corner to become upset. (Tr. 522-29). Before the two groups could begin fighting, however, the police arrived at which point "everybody scattered and ran." (Tr. 522-23).

Shortly after this encounter, Stewart picked up Petitioner and several other individuals. (Tr. 524-26). Eventually, Stewart returned to the vicinity of Mills and Washington Streets. (Tr. 526-27). As Stewart was driving down the street, Richardson heard a single gunshot. (Tr. 527-33). Richardson asserted that he did not see who fired the weapon. (Tr. 528).

**James Harris**

On the afternoon of March 29, 2007, Harris was riding around in a Suburban driven by Darris Stewart (a.k.a. Boodoo). (Trial Transcript, November 8, 2007, 593-602). At some point that afternoon, Harris and the other occupants of the Suburban attempted to fight some people from the "southside" at the intersection of Mills and Washington Streets, but were thwarted by the arrival of the police. (Tr. 595-98). Harris and the other occupants of the Suburban responded to this circumstance by declaring that they would return to that location "to fight 'em." (Tr. 598). Stewart continued driving around and later picked up Petitioner. (Tr. 598). Eventually, Stewart returned to the vicinity of Mills and Washington Streets. (Tr. 598-99). As Stewart was driving down the street,

8

Petitioner rolled down his window and shot his weapon, a semi-automatic pistol.  (Tr. 599-601).

**William Moorian**

As of April 10, 2007, Moorian was employed as a Detective for the Kalamazoo Department of Public Safety.  (Trial Transcript, November 8, 2007, 665).  On this date, Detective Moorian interviewed Kharis Richardson concerning the killing of William Berry.  (Tr. 665).  Richardson informed Moorian that Petitioner fired the shot from the Suburban that killed Berry.  (Tr. 666-69).

**James Wilson**

On the afternoon of March 29, 2007, Wilson was riding around in a Suburban driven by Darris Stewart (a.k.a. Boodoo).  (Trial Transcript, November 9, 2007, 685-86).  At some point, Stewart stopped at the intersection of Mills and Washington Streets, at which point they were accosted by "a whole bunch of southside dudes."  (Tr. 685-87).  Some of the other passengers in the Suburban responded by yelling "northside run the city."  (Tr. 687).  Stewart then parked the Suburban so that they could fight the "southside dudes."  (Tr. 687).  Before fisticuffs could commence, however, the police arrived at which point "everybody ran."  (Tr. 687).

Stewart continued driving around in the Suburban and eventually picked up several people including Petitioner.  (Tr. 687-88).  While the group was riding around, Antonio Maner stated that he wanted to return to the vicinity of Mills and Washington to "fight 'em."  (Tr. 686-89).  Stewart eventually returned to the vicinity of Mills and Washington Streets.  (Tr. 689-90).  As Stewart drove down Mills Street, Wilson heard somebody from inside the Suburban fire a single

9

gunshot.  (Tr. 689-90).  Because Wilson was sitting in the front passenger seat when the shot was fired, he was unable to see who fired the shot.  (Tr. 689-93).

**Antione Kyles**

On the afternoon of March 29, 2007, Kyles was riding around in a Suburban driven by Darris Stewart (a.k.a. Boodoo).  (Trial Transcript, November 9, 2007, 720-21).  At some point that afternoon, Stewart was driving through the "southside," when the Suburban was accosted by "some dudes."  (Tr. 721-22).  Kyles and the other passengers were going to fight these "dudes," but the police arrived before they could do so.  (Tr. 721-22).  Later that evening, Stewart was driving on Mills Street when Kyles heard a single gunshot.  (Tr. 722).  Kyles was unsure, however, whether the shot originated from within the Suburban.  (Tr. 722-23).  Kyles was also unsure whether Petitioner was riding in the Suburban at the time of the shooting.  (Tr. 723).

**Myron Moore**

At approximately 9:00 p.m. on the evening of March 29, 2007, Moore was picked up in a Suburban driven by Boodoo.  (Trial Transcript, November 9, 2007, 748-50).  There were several other individuals in the vehicle, including Petitioner.  (Tr. 748-54).  Later that evening, while Boodoo was driving on Mills Street, Moore heard a single gunshot.  (Tr. 749).  Moore did not, however, see who fired the shot.  (Tr. 757).

**Robert Daniels**

On the evening of March 29, 2007, Daniels was riding around in Boodoo's Suburban.

10

(Trial Transcript, November 9, 2007, 791-93).  Several other individuals, including Petitioner, were also riding in the vehicle.  (Tr. 792-804).  Later in the evening, as Boodoo was driving on Mills Street, Daniels heard a single gunshot.  (Tr. 800-03).  Daniels was unsure, however, who fired the shot or even if the shot originated from within or without the Suburban.  (Tr. 803-04).

**Darris Stewart**

On the afternoon of March 29, 2007, Stewart (a.k.a. Boodoo) was driving his family's black and grey Suburban.  (Trial Transcript, November 9, 2007, 828-29, 841).  Stewart and several of his friends were riding in vicinity of Mills and Washington Streets when somebody "threw something at the truck."  (Tr. 828-30).  Stewart and his friends were going to exit the Suburban and fight their assailants, but were unable to do so because the police arrived and "broke all that up." (Tr. 830).

Following this incident, Stewart continued driving around Kalamazoo and eventually picked up Petitioner.  (Tr. 830-35).  As Stewart was driving in the vicinity of the previous altercation, he heard a single gunshot which originated from the "right side" of the "second row" of his vehicle.  (Tr. 835-40).  Petitioner was sitting in the location from where the shot originated.  (Tr. 840-45).  Immediately after the shot was fired, Petitioner stated, "I caught the shell."  (Tr. 846).

**Markus Harris**

On the afternoon of March 29, 2007, Harris was riding around in Darris Stewart's Suburban with several other individuals.  (Trial Transcript, November 15, 2012, 914-16).  At some point that afternoon, Harris and the others had an altercation with "some southside people" at the

intersection of Mills and Washington Streets.  (Tr. 915-17).  Before the altercation could become violent, however, the police arrived and "broke it up."  (Tr. 916-18).  Following this incident, the group continued riding around in Stewart's Suburban.  (Tr. 917-20).  At some point, Petitioner entered the Suburban.  (Tr. 920).  Later that evening, while Stewart was driving on Mills Street, Harris heard a single gunshot.  (Tr. 920-25).  Harris testified that he did not know who fired the shot. (Tr. 922-26).

**Michael Werkema**

As of March 29, 2007, Werkema was employed as Detective with the Kalamazoo Department of Public Safety.  (Trial Transcript, November 15, 2012, 979-82).  The following day, Detective Werkema interviewed Markus Harris.  (Tr. 982-84).  Harris told Werkema that he saw Petitioner fire the shot that killed William Berry.  (Tr. 965-66, 976, 983-90).

**Devin Hughes**

On the evening of March 29, 2007, Hughes was riding around in Darris Stewart's Suburban.  (Trial Transcript, November 15, 2012, 999-1005).  There were several other individuals in the vehicle, including Petitioner.  (Tr. 1001-03).  As the group was riding around, Hughes heard some of the other passengers declare that they were going "to get into a fight" later that night.  (Tr. 1001-04).  Later that evening, as Stewart was driving in the vicinity of Mills and Washington Streets, Hughes saw Petitioner roll down his window and fire his weapon.  (Tr. 1006-18).

**Tanya Hollin**

Tanya Hollin is Devin Hughes' mother. (Trial Transcript, November 15, 2012, 1062). Hollin testified that Devin was scared to testify against Petitioner because he feared he would be "retaliated against." (Tr. 1068-69). Devin was forced to quit high school because of the threats he was receiving regarding this matter. (Tr. 1069).

**Dianne Anderson**

Anderson is Devin Hughes' grandmother. (Trial Transcript, November 15, 2012, 1073). Anderson was also aware that Devin was scared to testify against Petitioner. (Tr. 1074).

**Jeffrey Johnson**

Johnson served as the "lead detective" in the investigation of the killing of William Berry. (Trial Transcript, November 15, 2012, 1075). Johnson began working the case the night of the shooting and within a "few hours" learned the identities of several of the individuals who were riding in the Suburban at the time of the shooting. (Tr. 1075-76). Johnson subsequently interviewed Devin Hughes, who informed him that he saw Petitioner "fire the gun at some people that were on the porch." (Tr. 1077-79).

**Sarah Shealy**

Shealy testified for the defense that as of March 29, 2007, she lived 1316 Race Street, which was located "just to the. . .west of" Mills Street. (Trial Transcript, November 15, 2012, 1111-12). Shealy testified that on the night in question she heard two gunshots "only a couple of seconds"

apart.  (Tr. 1112-14).  Shealy conceded, however, that she did not know "where the gunshots came

from" or "whether they were related to each other."  (Tr. 1115).

**Emmanuel Jamarr Atkins**

Petitioner acknowledged that he was in Darris Stewart's Suburban on the night in

question.  (Trial Transcript, November 16, 2012, 1137).  Petitioner knew that many of the other

passengers in the Suburban were involved in an altercation earlier in the day and wanted to find the

people involved and fight them.  (Tr. 1154-55).  Petitioner also acknowledged that before entering

the Suburban he was asked if he had a gun.  (Tr. 1173).  Petitioner conceded that he was present in

the Suburban when the shot which killed William Berry was fired, but Petitioner asserted that James

Harris fired the shot in question.  (Tr. 1126, 1153-62, 1171).

**Harold West**

Detective West was recalled to testify as a rebuttal witness, following Petitioner's

testimony.  West testified that when he interviewed Petitioner, Petitioner never asserted that James

Harris fired a weapon on the night in question.  (Trial Transcript, November 16, 2012, 1200).

**Jeffrey Johnson**

Detective Johnson was also recalled to testify as a rebuttal witness, following

Petitioner's testimony.   Johnson testified that, aside from Petitioner's trial testimony, the

investigation into William Berry's killing uncovered absolutely no evidence that James Harris was

the individual who fired the fatal shot.  (Trial Transcript, November 16, 2012, 1202).

14

Following the presentation of evidence, the jury found Petitioner guilty of first degree murder and possessing a firearm during the commission of a felony. (Trial Transcript, November 19, 2007, 1331-32). Petitioner was sentenced to serve life in prison without the possibility of parole on the first degree murder conviction, as well as an additional two years on the possession of a firearm during the commission of a felony conviction. (Sentence Transcript, December 10, 2007, 14-15). Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claims:

I.    Defendant-Appellant is entitled to a new trial where he was denied his constitutional right to a public trial.

II.   Defendant-Appellant's conviction should be reversed because there was insufficient evidence to find for the conviction of first degree murder.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Atkins*, 2009 WL 1607578 (Mich. Ct. App., June 9, 2009). Asserting the following issues, Petitioner subsequently moved in the Michigan Supreme Court for leave to appeal:

I.    Defendant-Appellant is entitled to a new trial where he was denied his constitutional right to a public trial.

II.   Defendant-Appellant's conviction should be reversed because there was insufficient evidence to find for the conviction of first degree murder.

III.  Defendant-Appellant is entitled to a new trial where his trial lawyer was ineffective of assistance for not getting expert witnesses.

IV.   Defendant-Appellant is entitled to a new trial where his appellant lawyer was ineffective of assistance for not sending Defendant his transcripts so he could prepare a supplemental brief.

15

The court denied Petitioner's request, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Atkins,* 774 N.W.2d 883 (Mich., Nov. 23, 2009). On November 8, 2010, Petitioner initiated the present action in which he asserts claims I and II identified above.

## STANDARD OF REVIEW

Atkins' petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

16

question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, - - - S.Ct. - - -, 2011 WL 1225705 at *8

17

(Apr. 4, 2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits." *Id.* at 784-85. Where such is the case, the Court must

18

apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* If this presumption is overcome, however, the Court reviews the matter de novo. *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

### I.        Right to Public Trial

On the third day of trial, the trial judge granted the prosecutor's request to partially close the proceedings.  (Trial Transcript, November 8, 2007, 588-92).  Specifically, the judge partially closed the proceedings, permitting only the following individuals to remain in the courtroom: (1) Petitioner and his attorney; (2) prosecution team; (3) witness' immediate family members; (4) victim's immediate family members; and (5) any member of the press.  (Trial Transcript, November 8, 2007, 588-92; Trial Transcript, November 9, 2007, 785-89).  Petitioner argues that the trial judge's decision to partially close the courtroom during his trial violated his Sixth Amendment right to a public trial.

The Sixth Amendment to the United States Constitution guarantees to criminal defendants the "right to a. . .public trial."  U.S. Const. amend. VI.  This particular right applies in

19

state court criminal prosecutions via the Fourteenth Amendment. *See Argersinger v. Hamlin*, 407 U.S. 25, 27-28 (1972). The right to a public trial is "deeply rooted in the common law" and embodies the principal that "justice must satisfy the appearance of justice." *Levine v. United States*, 362 U.S. 610, 617 (1960). While the right to a public trial is of great importance, like many constitutional rights it is subject to limitation in certain limited circumstances. *See, e.g., Waller v. Georgia*, 467 U.S. 39, 43-47 (1984).

In *Waller*, the Court examined "the extent to which a hearing on a motion to suppress evidence may be closed to the public over the objection of the defendant consistently with the Sixth and Fourteenth Amendment right to a public trial." *Id.* at 40-41. Prior to trial, the defendants moved to suppress certain evidence obtained by (or as a result of) wiretaps. *Id.* at 41. Arguing that under Georgia law, disclosure to the public of certain information obtained pursuant to a wiretap would invalidate the evidence in question, the state "moved to close to the public any hearing on the motion to suppress." *Id.* The court agreed and "ordered the suppression hearing closed to all persons other than witnesses, court personnel, the parties, and the lawyers." *Id.* at 42.

The *Waller* Court, after concluding that the right to a public trial extended to "a suppression hearing conducted prior to the presentation of evidence to a jury," turned to the question of whether Waller's right to a "public trial" was violated by the trial court's action. In this respect, the Court observed that "the requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *Id.* at 46. Nevertheless, as the Court further observed, "the right to an open trial may give way in certain cases to other rights or interests." *Id.* at 44. Specifically, the Court held

20

that:

> the party seeking to close the [proceeding] must advance an
> overriding interest that is likely to be prejudiced, the closure must be
> no broader than necessary to protect that interest, the trial court must
> consider reasonable alternatives to closing the proceeding, and it must
> make findings adequate to support the closure.

*Id.* at 48.

Finding that the trial court's findings and rationale were insufficient to justify "the

closure of the entire suppression hearing," the Court found that Waller's right to a public trial had

been violated and ordered the matter remanded to the trial court.  *Id.* at 48-49.  Specifically, the

Court observed:

> Applying these tests to the cases at bar, we find the closure of the
> entire suppression hearing plainly was unjustified.    Under
> *Press–Enterprise*, the party seeking to close the hearing must advance
> an overriding interest that is likely to be prejudiced, the closure must
> be no broader than necessary to protect that interest, the trial court
> must consider reasonable alternatives to closing the proceeding, and
> it must make findings adequate to support the closure.  In this case,
> the only evidence about which the prosecutor expressed concern was
> the information derived from the wiretaps; he argued that unnecessary
> "publication" would render the taps inadmissible under the Georgia
> wiretap statute.  The Georgia Supreme Court advanced the more
> general, but essentially identical, interest in protecting the privacy of
> persons not before the court.  Under certain circumstances, these
> interests may well justify closing portions of a suppression hearing to
> the public.
>
> Here, however, the State's proffer was not specific as to whose
> privacy interests might be infringed, how they would be infringed,
> what portions of the tapes might infringe them, and what portion of
> the evidence consisted of the tapes.  As a result, the trial court's
> findings were broad and general, and did not purport to justify closure
> of the entire hearing.  The court did not consider alternatives to
> immediate closure of the entire hearing: directing the government to
> provide more detail about its need for closure, in camera if necessary,
> and closing only those parts of the hearing that jeopardized the

interests advanced.  As it turned out, of course, the closure was far more extensive than necessary. The tapes lasted only 2 1/2 hours of the 7–day hearing, and few of them mentioned or involved parties not then before the court.

*Id.*

A review of the record in the present matter, however, reveals that the state court's resolution of this matter is not contrary to, or an unreasonable application of, the *Waller* standard. At the outset of the second day of trial, before the presentation of any testimony, the prosecutor moved the court to close the proceedings.  (Trial Transcript, November 7, 2007, 227-32).  This request was made in light of extensive witness intimidation that was taking place.  Specifically, the prosecutor stated as follows:

Your Honor, strongly this entire trial from the beginning, including the preliminary exam, have been dynamics of witnesses being threatened and intimidated to testify in Court.  There's an underlying dynamic in this case of gangs, of guns, of threats.  It's been happening in the schools, it's been happening in this hallway of this very Courtroom.  Witnesses have been intimidated.  After one witness testified at the preliminary exam he was chased around with a bat shortly afterwards, and he made a police report about that - - or excuse me, the police talked to him about that.  It's my understanding that witnesses that were here yesterday, when they were leaving the Courtroom, were threatened by certain people who are in the gallery on their way out of Court.

All of the witnesses that I have talked to have indicated an extreme reluctance to testify.  We have here a pretty full Courtroom of youngsters, who some of which probably ought to be school, whose main purpose is probably here to intimidate the witnesses.  In addition to that, we have internet threats throughout this case on various My Space websites, where it says things like, "We getta see who's snitching." "Good luck pussy." "This is for whoever tried to snitch on my Nigga Jammer G," who's the Defendant. "Yeah Bitch, you gonna get and when you get you gonna get it hard, trust me." "Free my Nigga Jammer G." "The hood miss you, man, it ain't the same." "Let my Northside Niggas free, man." This is the kind of

thing that's on the internet of the My Space pages of the witnesses in this case.  This is the environment in which we're expected to have a fair and open hearing on whether or not the Defendant committed a crime.

Further, web space messages say things such as, "Real Niggas don't break the code.  Free Jammer."  "You don't even hang out late night, pussy, you scared," referring to one of the witnesses, who apparently doesn't run the streets any more with some of his buddies.  "Real Niggas don't break the code.  Free Jammer."

This is the stuff that's going on in this case, Your Honor.  It's a horrible environment in which to have to bring witnesses in to testify, and under these circumstances I am moving to close this trial to everybody except the detective in charge of this case, and the witnesses' family members, the victim family members, and the Defendant's immediate family.

I have two cases that I presented to Judge Bridenstine at the preliminary exam.  Both are unpublished, however, they cite all the standards of the published cases.  One is People versus Lamont Heard, and it's Court of Appeals Number 221827.  The other is People versus Bonner.  It's Court of Appeals Number 242184.

Essentially the Courts hold that the protection of a witness against intimidation and threats and ensuring the integrity of the judicial system and furthering the search for truth are clearly compelling and/or substantial interests which justify closure of the Courtroom. Courts have determined that excluding spectators during witness's testimony is proper when there is a justifiable purpose such as to protect witnesses from harassment and physical harm, and to protect a witness with a fear of testifying in public.  There's a proper reason for closure.  We must also decide whether the closure is narrowly tailored.

Now we narrowly tailored it at the prelim to just four witnesses.  I'm asking the Court to close this trial entirely because we have two-thirds of the witnesses who are gonna testify are all folks that have to deal with the people who are in the audience today.  They're youngsters.  They're kids who go to school in this community. They're kids who are on the streets in this community.  They're kids who don't want to be here.  If they have to worry about even coming to Court or leaving to Court about whether they're gonna be safe and

23

secure, that's something that nobody should have to worry about. And in light of the circumstances of this trial, I believe a closure is appropriate.

I'll give the Court my case law.  There's different standards for complete closures than for partial closure.  I won't get into all that, but it's in the case law and it's every other minute so far this morning people have been whispering in my ear other things that have been happening.  When I say people, I'm talking about Detective Johnson, his - - and he can even articulate perhaps more specifically than me some of the threats that have been going on in this case, if the Court wishes a better factual basis.  But in light of what's going on, I, myself, am nervous.  It's - - I shouldn't have to be worried about this. We should be able to have witnesses come into a Courtroom and testify about the truth of what happened without worrying about these kinds of threats.  It's ridiculous.  It's inappropriate.  I'll give the Court my case law.

If I could just indicate one additional thing, Judge.  This first internet posting that I read to you, "We're gonna see who's snitching.  Good luck pussy," etcetera, etcetera, has a picture of a gun on it too, and I'd like to hand this to the Court so it can refer to some of this internet stuff when its making its ruling.

(Tr. 227-33).

The trial judge, however, denied the prosecutor's request, finding as follows:

The Court does have concerns with regards to the things I've heard about, the threats and the intimidation.  I'm concerned by the fact that we have a number of young people here that seem be of an age where maybe they should be in school and they are here.  And I'm also concerned by the fact that there seemed to be a lot of smiles and smirks when certain things were being read about what was on the internet.  That's not appropriate.

I'm not going to close the Courtroom at this time.  I know, counsel, we have discussed partial closure for certain witnesses, and I think that that would be appropriate under the circumstance.  We'll address those when the witnesses testify.  However, I will indicate that I've indicated what the guidelines are for being in the Courtroom.  I've indicated that text messaging and comments, threatening behavior, that type of thing, will not be tolerated, and the deputies are

authorized to arrest anyone, and find - - and - - and I will find them in contempt of failing to comply with those requirements.  This is a serious matter and I expect everyone to be on their best behavior here and when you're leaving the Courtroom.

(Tr. 233-34).

The following day, the prosecutor renewed his request:

Your Honor, I'm renewing my request for closed Courtroom.  At this time for four witnesses that may wind up being followed.  The four are the same that testified at the prelim, and for the same reasons I stated at the prelim and earlier in my motion, and based on the same case law and facts.

The next witness that I will be calling to the witness stand is James Harris, who is currently out of state, living out of state because of this very situation and the threats that have gone on.  His parents wanted him out of this jurisdiction, and will be leaving tonight again after his testimony here.  So I would ask for James Harris, Devin Hughes, Markus Harris, and Darris Stewart, at the very minimum, that their testimony be to a closed Courtroom, that the only people allowed in the Courtroom besides the parties be the victim's mother, the Defendant's mother and or father.  Actually my request in chambers was to exclude them as well, and the parents of the witnesses, and Detective Johnson of course.

(Trial Transcript, November 8, 2007, 588-89).

The trial judge granted this particular request, specifically finding as follows:

Well the Court has discretion, but there's a substantial reason to allow for a partial disclosure - - or closure of the Courtroom, and in this particular case I will indicate we have various young folks who have been sitting through the trial.  When I observed them and when there's - - when there has been testimony or the attorneys have been viewing the documents that have not been offered as exhibits, but documents that have been apparently pulled off the internet, referencing gangs and certain threats and so forth with regards to this particular trial, they seem to be - - some of them seem to be quite interested in those documents and - - and I do have some concern about - - about that.

25

I have been made aware that the jurors have been somewhat concerned. They requested that they be assisted to their vehicles, and there's also information that witnesses have been threatened in this particular case in the past at the prelim, and there has been concerns about that throughout the trial.

I know there's been concerns about individuals and some of the individuals have been asked to be excused from the Courtroom for making comments about the deputies' guns, and I know that - - my understanding is there have been at least four individuals who have been removed by the deputies. And I - - there's has been additional security throughout this trial. I think for - - due to the past threats and the concerns about the witnesses testifying and so forth

Also with regards to the cases that were addressed at the time of the preliminary exam and that the Prosecuting Attorney is relying on, one of them specifically, People versus Bonner, that's a two threat - - 2003 case. Similar situation in that particular case. That was a sort of neighborhood crime where everyone knew everyone, and there was a possibility of threats and intimidation, and I think we have the same situation. We clearly have the same situation here, and so to protect the witnesses against threats or intimidation, and to ensure the integrity of the judicial system to make sure that the witnesses are comfortable and testifying truthfully, the Court does find that there are substantial interests in partially closing the Courtroom.

The Court is allowing the parents of the witness, Mr. Atkins, and the victim to remain in the Court during the testimony, and also I am not excluding the press. There is no - - no one from the press that is present at this time. So we'll proceed in that manner.

(Tr. 589-91).

The following day, the trial judge reiterated her decision to partially close the

proceedings:

Okay counsel, after the - - over lunch we had a conversation. I had some - - apparently there was some comments made by the jurors about some individuals that were standing near the elevator when they were returning from lunch. There were a couple of comments made. One of the comments was something to the effect off - - or one of the individuals was apparently counting, appeared to be

26

counting the number of jurors, and then one individual, or the same individual, said something about, "There's six more," or "There's the last six," referring - - or the jurors felt that they were referring to them, and then some other comment was made.  I don't know whether the particular individual or those particular individuals were making comments or what the purpose of comments was for.  Whether they were just counting the number of individuals or jurors that were returning from lunch, and it was an innocent type of comment or not.

The thing that concerns the Court is that the jurors brought it to our attention.  So they felt a little uncomfortable or threatened by the situation, which causes the Court some concern.  My understanding is that there's also a concern by witnesses again, and we talked about this in the past or it's been placed on the record in the past, that comments are being made on the street or in the neighborhoods or whatnot about - - threatening comments about individuals that may or may not or what - - what individuals are going to say or if they're gonna testify in this particular case and what may happen to them.  I don't know the exact comments, but another concern was brought to the Court's attention.  Mr. Fenton, maybe you can elaborate more on what that was.

In any event, the Court previously indicated that my ruling that I was not going to close the Courtroom or partially close the Courtroom, that I would continue to consider that depending on how things went through the trial.  I'll also indicate that we are escorting the jurors to their vehicles when we recess for the day.  There's been some concerns with regards to that expressed by the jurors.

So given those additional factors, the Court has made a decision to partially close the Courtroom for - - and for all of the reasons that have been outlined on the record, and all the other discussions and so forth that have been laid out, the other information that's been laid out, the Court is making the decision to partially close the Courtroom for the remainder of the trial.  The Court previously outlined the case law and so forth, but again due to these additional concerns and the additional information on top of everything else, I am making that decision.

I am allowing family members in.  My understanding is that Mr. Atkins has some family, here's some aunts, that his parents are not here in the afternoon just because they work, and so those individuals

are welcome to sit in during the trial.  I'm not excluding the press and I'm not excluding the family members of either the victim or - - or I should say the parents or immediate family of the either the victim or any witness who testifies.  So that's the Court's ruling for the remainder of the trial.

$$* \qquad\qquad * \qquad\qquad *$$

Then I'll also indicate that my understanding is there's additional information on the internet, and some additional internet threats that have been found on My Space accounts.

$$* \qquad\qquad * \qquad\qquad *$$

So I am allowing the siblings of the victim to remain in the Courtroom, and as indicated before, Mr. Atkins' aunt - - or aunts may also watch the remain - - the remainder of the trial.

(Trial Transcript, November 9, 2007, 785-89).

As these excerpts make clear, there existed an overriding interest in limiting the public's access to Petitioner's trial, namely the safety of witnesses and jurors as well as the integrity of the criminal justice system.  The trial judge's actions were limited and impaired the public's right of access only to the extent necessary to protect the interests in question.  Before partially closing Petitioner's trial, the trial judge attempted to protect the witnesses and jurors through action short of closure.  Finally, the trial judge clearly articulated on the record her rationale for partially closing Petitioner's trial.  The Michigan Court of Appeals rejected Petitioner's claim, finding that the trial judge's actions were consistent with the standard articulated by the *Waller* Court:

The record indicates that the nature of this offense involved two neighborhood street gangs, and there was a high likelihood of influence and intimidation from spectators.  The shooting was the culmination of a clash between geographically based neighborhood street gangs, and the trial court and prosecutor noted that there were many young people in the courtroom, many of whom appeared to be from the same high school as the witnesses.  In addition, threats were

28

posted on the Internet, and, according to the prosecutor, some of the witnesses indicated they were afraid to testify in court. The threats posted online warned some witnesses that there would be retaliation depending on who testified and who "snitched." One witness testified that his parents forced him to leave the city, another admitted during testimony that a person chased him with a baseball bat after he testified at the preliminary examination, and another testified that he dropped out of school after being harassed. Furthermore, the prosecutor indicated that witnesses were being threatened as they left the courtroom. The trial court also noted that four individuals were removed from the courtroom for inappropriate comments about weapons carried by deputies, that jurors were being escorted out of the courthouse as a safety precaution, and that a juror complained about a remark directed at the jury during a break. Under these circumstances, we find there was a substantial interest in partially closing the courtroom to ensure that witnesses were testifying without threats or intimidation and to protect the integrity of the judicial system.

Additionally, the closure was narrowly tailored, the trial court properly articulated findings on the record, and it considered alternatives to a total closure. Here, the trial court narrowly tailored the closure to allow relatives of defendant, the victim, and the testifying witnesses, as well as members of the media to remain in the courtroom. The trial court properly articulated findings on the record; specifically, the trial court discussed that threats were being made against several witnesses, that the crime was a "neighborhood crime," that rival gangs and many high school-aged individuals were involved, that threatening messages were posted online, that a comment was directed at a juror, and that several individuals were removed from the courtroom for inappropriate remarks about weapons. This record is sufficient to allow this Court to determine that the closure was proper. Furthermore, the trial court properly considered alternatives to totally closing the courtroom. The court left the courtroom open for the first 11 witnesses, it offered to open the courtroom during the testimony of police officers, and it allowed relatives and media members to remain.

*People v. Atkins*, 2009 WL 1607578 at *3-4.

In light of the aforementioned authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established

federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

## II.        Sufficiency of the Evidence

Petitioner asserts that he is entitled to relief because the prosecution failed to present sufficient evidence to support his conviction for first degree murder.  Specifically, Petitioner argues that "there was insufficient evidence to find for the requirement of premeditation and deliberation."

Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt.  *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury.  *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006).  Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

Pursuant to Michigan law in effect at the time of William Berry's murder, an

individual was guilty of first degree murder if the following elements were satisfied: (1) the defendant intentionally killed the victim, and (2) the killing was deliberate and premeditated. *People v. Wofford*, 492 N.W.2d 747, 749 (Mich. Ct. App. 1992). To establish premeditation and deliberation, the prosecution must prove that there existed "some time span between the initial homicidal intent and ultimate action." *People v. Gonzalez*, 664 N.W.2d 159, 163 (Mich. 2003). However, "[t]he interval between the initial thought and ultimate action" need only be long enough to "afford a reasonable person time to take a second look." *Id.* Premeditation and deliberation may be inferred from the circumstances surrounding the killing. Furthermore, premeditation may be established through evidence of the following factors: (1) the prior relationship of the parties, (2) the defendant's actions before the killing, (3) the circumstances of the killing itself, and (4) the defendant's conduct after the killing. *Id.*

Under the doctrine of transferred intent, the "general intent to kill need not be directed at an identified individual or the eventual victim." *People v. Abraham*, 662 N.W.2d 836, 841 (Mich. Ct. App. 2003). Thus, the prosecution was not required to prove that Petitioner intended to kill William Berry. Instead, the prosecution needed only to prove that Petitioner "had the intent to kill, regardless of whether it was directed as a specific person." *People v. Daniel*, 2007 WL 866469 at *2 (Mich. Ct. App., Mar. 22, 2007).

The Michigan Court of Appeals rejected Petitioner's insufficiency of the evidence claim, concluding as follows:

> In this case, the evidence viewed in a light most favorable to the prosecution showed that defendant had a motive to commit the murder. Several witnesses testified at trial that the group inside the Suburban was involved in an altercation with a rival street gang earlier in the day. Following the altercation, certain members of the

group wanted to return to the area to fight the rival gang. Defendant was informed of the earlier altercation and joined the others in the Suburban. Defendant himself acknowledged during his testimony that certain members of the group informed him they wanted to return to fight the other group, and asked him if he had a gun.

Additionally, the evidence viewed in a light most favorable to the prosecution showed that defendant planned to shoot someone that night and that he had adequate time for a "second look." Defendant brought a gun with him in the Suburban after he was informed that the group wanted to fight. Defendant had time during the ride from his residence to the scene of the shooting to contemplate and reflect upon his actions. According to witnesses' testimony, the Suburban drove past Mills, where the group inside the vehicle observed a crowd of people gathered on a porch, some of whom were involved in the earlier altercation. The Suburban then turned around in a driveway and circled back, turning onto Mills. During this time, defendant had an opportunity for a "second look" and time to contemplate his actions. According to the testimony of the witness who was seated next to defendant in the Suburban, as the vehicle approached the house, defendant's window rolled down, and defendant pointed a gun out of the window and fired a shot at the porch where the kids were gathered. As defendant's window rolled down and he pointed the gun, he had yet another opportunity for a "second look" and to reflect on his actions before he fired the weapon into the crowd of people on the porch.

*People v. Atkins*, 2009 WL 1607578 at *4-5.

In light of the aforementioned authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## <u>CONCLUSION</u>

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States.  Accordingly, the undersigned recommends that Atkins' petition for writ of habeas corpus be **denied**.  The undersigned further recommends that a certificate of appealability be denied.  *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  October 30, 2012                                    /s/ Ellen S. Carmody
                                                                          ELLEN S. CARMODY
                                                                          United States Magistrate Judge